**UNITED STATES of America,
Appellee,**

v.

**Charles TOMAIOLO and Louis Soviero,
Appellants.**

**No. 390, Docket 24509.**

United States Court of Appeals
Second Circuit.

Argued June 7, 1957.

Decided Nov. 21, 1957.

Maurice Edelbaum, New York City, for appellant Charles Tomaiolo.

Marvin Schwartz and Andrew N. Heine, New York City, for appellant Louis Soviero.

Louis Soviero, pro se.

Cornelius W. Wickersham, Jr., Chief Asst. U. S. Atty., Brooklyn, N. Y., and Warren Max Deutsch, Asst. U. S. Atty., Eastern Dist. of New York, New York City (Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

Defendants appeal from judgments of conviction entered against them after a jury trial in the Eastern District of New York. Tomaiolo was convicted on three counts: (1) conspiring with Louis Soviero, Abraham Nirenberg and Salvatore Catapano to rob the State Bank of Suffolk, in Brentwood, New York, on November 29, 1955; (2) bank robbery of $35,033.07 in cash and $6,290. in negotiable travelers checks; and (3) putting in jeopardy the lives of the bank employees during said robbery, in violation of 18 U.S.C.A. §§ 371, 2113, 2113(a) and 2113(d). Soviero was convicted on three counts: (1) for the conspiracy to rob the bank; (2) aiding and abetting the robbery; and (3) as an accessory after the fact, in violation of 18 U.S.C.A. §§ 2, 3, 371 and 2113.

The principal witness for the government was Mrs. Pauline Katz, who had been Abraham Nirenberg's mistress and an active participant in the conspiracy although she was not indicted and was not named as a co-conspirator.

There was ample evidence from which the jury could find the guilt of the defendants: Commencing in early November 1955, Nirenberg and Tomaiolo planned the robbery of the State Bank of Suffolk at Brentwood in Suffolk County, New York, which they finally committed on November 29, 1955. Some days before, Tomaiolo, Nirenberg and Mrs. Katz drove to the vicinity of the bank and Mrs. Katz went in and changed a $10 bill so that she could describe to Tomaiolo and Nirenberg the physical layout of the bank.

Louis Soviero arranged to have two of his nephews steal a black Buick sedan for use as the getaway car. To this car Soviero attached some license plates which his brother had secured under an assumed name. At the last minute Louis Soviero had a change of heart and said that he could not join Tomaiolo and Nirenberg in the robbery, but he did turn over to Nirenberg the stolen Buick. Tomaiolo and Nirenberg then decided to use a submachine gun in place of a third confederate and Tomaiolo arranged for it and Nirenberg picked up and paid for the machine gun the day before the robbery.

On the day of the robbery Tomaiolo, Nirenberg and Mrs. Katz drove out to Central Islip to the vicinity of where Nicholas Tomaiolo, Charles Tomaiolo's brother, worked as a presser in a clothing establishment. Charles Tomaiolo left his car there and Nirenberg took Nicholas Tomaiolo's blue Plymouth. Tomaiolo and Nirenberg then drove to the Brentwood bank in the stolen Buick while Mrs. Katz waited in the blue Plymouth at a point one mile from the bank and three blocks from Nicholas Tomaiolo's home. About 2 P.M., revolver in hand, Nirenberg entered the bank accompanied by a smaller man who brandished a machine gun. Although his confederate wore a snap brim cap and kept his face hidden with a yellow glove so that only his eyes, eyebrows and sideburns were visible, there was an abundance of evidence, particularly the testimony of Mrs. Katz, from which the jury could conclude that the masked robber was Charles Tomaiolo. Nirenberg and Tomaiolo forced the bank manager, two tellers, and a customer into the back room and they took $35,033.07 in cash and negotiable travelers checks totaling $6,290. They then made their getaway in the stolen Buick.

When Tomaiolo and Nirenberg returned to the rendezvous where Mrs. Katz was waiting in the blue Plymouth, they left the stolen Buick in the bushes, changed their clothes and all three drove away in the Plymouth to the nearby home of Nicholas Tomaiolo. In their haste they had no time to remove the tell-tale license plates from the stolen car. Upon arrival at Nicholas Tomaiolo's they were seen by Mrs. Patricia Jennings who lived directly across the street. Here Tomaiolo, Nirenberg and Mrs. Katz got out and went into the house. The following day, November 30, at Nirenberg's apartment, Tomaiolo and Nirenberg di-

vided the loot after giving Soviero $140. Three days later Mrs. Katz delivered $200. more to Soviero for the men who had stolen the Buick. Of this $200. Soviero's nephews, Frank Labocetta and Vincent Boccia, each received $75. from Soviero.

Shortly after the robbery the machine gun was concealed at 70 East 92nd Street, Brooklyn, in the basement apartment of Salvatore Catapano. Sometime in December Nirenberg and Soviero moved the machine gun from one place to another in the apartment and finally when they left New York for Florida in late January they took the machine gun with them in the trunk of Nirenberg's car.

Two months later, when Tomaiolo was taken into custody by the police on January 23, 1956 for a parole violation the nature of which does not appear, Nirenberg and Mrs. Katz moved to a Brooklyn hotel under an assumed name. The next day, they, together with Louis Soviero, left New York and drove to Miami and to Covington, Kentucky and finally to Buffalo, New York where they stayed under various assumed names at Nirenberg's expense.

On February 12, 1956, FBI agents arrested Soviero and Nirenberg in Buffalo. Mrs. Katz immediately became a government witness and after her testimony before the grand jury on February 21, 1956, Tomaiolo and Soviero were indicted together with Salvatore Catapano and Nirenberg. Catapano pleaded guilty to a count charging him with being an accessory after the fact. On the government's motion Nirenberg was tried separately and convicted and on appeal we affirmed the conviction, United States v. Nirenberg, 2 Cir., 242 F.2d 632, certiorari denied 1957, 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539.

Tomaiolo complains particularly of five errors regarding the admission of evidence and the conduct of the trial: (1) his cross-examination as to certain parole violations as an attack on his credibility; (2) the cross-examination of his brother, Nicholas Tomaiolo, to show that the witness had claimed his Fifth Amendment privilege when questioned before the grand jury; (3) the cross-examination of Nicholas Tomaiolo regarding A.W.O.L. violations while he was serving in the Army; (4) the action of the District Judge in moving the trial some sixty miles to take the testimony of the government witness, Mrs. Patricia Jennings, in the basement of her home; and (5) the summation of the Assistant United States Attorney wherein he argued that Pauline Katz had told Maurice Edelbaum, Tomaiolo's attorney, that Tomaiolo was guilty and that this was the reason that Mr. Edelbaum refused to advise her.

Soviero complains of three errors: (1) the government's repeated allusions to his criminal record; (2) the action of the District Judge in compelling the witness Eileen Calvo to testify despite her claim of privilege under the Fifth Amendment, which claim of error we do not find necessary to discuss in view of our disposition of Soviero's appeal; and (3) the government's refusal to turn over certain Federal Bureau of Investigation reports to Soviero for purposes of cross-examination of FBI Agent Liddy, which we need not consider in view of 18 U.S.C. A. § 3500 recently enacted into law after the decision in Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed. 2d 1103.

### The Defense

Charles Tomaiolo took the stand in his own behalf and denied any participation whatsoever in the robbery or any knowledge of it. He stated that on the day of the robbery, November 29, he was at home suffering from ulcers and he produced witnesses to support his alibi—a woman who testified she was nursing his mother-in-law at the time and a friend of his mother-in-law. The testimony of the nurse was rebutted in part by the mother-in-law's doctor who was called by the government.

Charles Tomaiolo denied ever having been to his brother's home with Nirenberg and Mrs. Katz. He admitted that he had known Nirenberg since they had been in state prison together in about 1945, that he had met Mrs. Katz and

that he had seen both Nirenberg and Mrs. Katz on numerous occasions.

In addition to this evidence, Charles Tomaiolo's brother, Nicholas, took the stand and testified that the appellant, Charles Tomaiolo, Nirenberg and Mrs. Katz had not visited his home on the evening of the robbery and that they had not borrowed his car. He testified that Nirenberg and Mrs. Katz had never visited his home although he admitted that they had come out to see him at his place of business to buy some coats.

Louis Soviero did not take the stand and called no witnesses in his defense.

## I. Errors as to the defendant Charles Tomaiolo

### A. The cross-examination of the defendant Charles Tomaiolo

Charles Tomaiolo complains that the Court permitted cross-examination about acts which he had allegedly committed while confined to prison for a previous offense, about acts in violation of the rules of the New York State Parole Board while he was on parole, and about his association with persons who had criminal records. In our opinion all of this evidence was erroneously admitted. We also find numerous other errors with respect to the conduct of the Assistant United States Attorney in cross-examining Tomaiolo, and with respect to the admission of evidence. We do not hold that any one of these errors by itself would require a reversal of Tomaiolo's conviction. What we do hold is that in the aggregate these errors made it impossible for the defendant to be fairly tried.

First, after Tomaiolo had testified on direct examination that in 1941 he had pleaded guilty to the robbery of a candy store, the Court permitted lengthy and needlessly detailed examination into the circumstances of the robbery. This included such details as how many people were involved with him, how he was apprehended, how many bullets he had in his pocket when he was arrested, and how many of his co-defendants were charged with armed robbery. This examination even went to the length of bringing out, over objection, that in the 1941 case Tomaiolo had been represented by Maurice Edelbaum, the same attorney who represented him at the trial.

We cannot see that any of this detail was relevant to the charge on trial; it went far beyond what was necessary to establish a criminal conviction for the purpose of impeaching credibility. Its obvious purpose and effect was to do more than to impeach defendant's credibility—it was intended to show that he was a dangerous criminal. Although the degree to which counsel may dwell on a particular point is within the discretion of the trial judge, it seems to us that here this discretion was not wisely exercised. People v. Slover, 1921, 232 N.Y. 264, 133 N.E. 633; People v. Hawley, 4 Dept. 1955, 285 App.Div. 1009, 139 N.Y. S.2d 489; Little v. State, 1945, 79 Okl.Cr. 285, 154 P.2d 772; see also People v. Du Byk, 1 Dept. 1955, 285 App.Div. 1025, 139 N.Y.S.2d 577, dissenting opinion. Compare Walker v. State, 1929, 151 Miss. 862, 119 So. 796; People v. Guiterrez, Cal.App.1957, 312 P.2d 291.

Further evidence was adduced, over objection, regarding the alleged robbery by the defendant of a gas station in 1941 and how much money had been stolen from the gas station. From this the questioning led to whether he had stated in a form made out many years later for the Waterfront Commission that he had robbed a gas station. In the first place, it was never shown what the defendant had stated on the form. Moreover, for this alleged crime, supposedly committed the same evening as the candy store robbery, defendant had not been convicted, and he denied any participation in such a crime. After such denial and in the absence of proof of conviction, it was error to permit further questioning about the alleged offense. United States v. Nettl, 3 Cir., 1941, 121 F.2d 927.

Secondly, the prosecutor asked a series of questions regarding Charles Tomaiolo's conduct during the nine years of his

imprisonment on the 1941 charge. The prosecutor put a question whether a prison inmate whom he had allegedly beat up had gone to the hospital, and upon objection, this was withdrawn.

The Assistant United States Attorney then asked these questions, over objection:

"Q. Did you also burn up some furniture in your cell while you were there? A. No, sir.

\* \* \* \* \* \*

"Q. Did they find you with a knife while you were there?

\* \* \* \* \* \*

"A. No, sir.

\* \* \* \* \* \*

"Q. Weren't you given 30 days punishment on July 31, 1942 for having a knife in your cell? A. No, sir. I had a permit for the knife."

Thirdly, the prosecutor offered, over objection, and the Court received, a copy of the General Rules Governing Parole issued by the State of New York Executive Department, Division of Parole, and this part of paragraph 4 was read to the jury:

· "You must conduct yourself as a good citizen. This means that you must not associate with evil companions or any individuals having a criminal record; that you must avoid questionable resorts, abstain from ·wrongdoing, lead an honest, upright and industrious life, supporting your dependents, if any, and assuming towards them all your moral and legal obligations \* \* \* "

The prosecutor also referred to paragraph 8 of the Rules Governing Parole which provided that operating an automobile without a valid license would be considered a violation of parole, a valid license being one secured only after permission had been granted. It was then brought out that the defendant had operated an automobile without such permission.

Fourthly, the prosecutor elicited, over objection, that Charles Tomaiolo had knowingly associated with persons who had previously been convicted of crime. After securing the defendant's admission that he knew that his friend, Fred Miller, was a convict, the prosecutor brought out that Miller had been convicted and sentenced to a term of 10 to 30 or 10 to 20 years in prison and that they had been in state prison together.

Following this the defendant was asked whether Vincent Soviero, Louis Soviero's brother, had been in state prison with him. This was objected to but the objection was overruled and the defendant answered that he had been in Auburn State Prison. On the ground that this was prejudicial to Louis Soviero, who was on trial, his counsel moved for a mistrial. Then there followed numerous questions regarding the Soviero family and it developed that the defendant had visited at Vincent Soviero's home and knew members of the Soviero family. The defendant admitted that he met Louis Soviero at a New Year's Eve party in 1955 at which his wife, Nirenberg and Mrs. Katz had also been present. The prosecutor then attempted to show that prior to this time the defendant had met Louis Soviero at the home of his brother Vincent. The defendant admitted that he had met other members of the Soviero family there but stated he had not met Louis there. This line of inquiry ended with this question and answer:

"Q. So you met Charlie there and you met his sister there and you met Vincent there, but you never met Louis there? A. Sir, he was in prison at the time."

Louis Soviero's counsel promptly moved for a mistrial which was overruled by the District Judge who at the suggestion of the prosecutor instructed the jury to "[d]isregard the last statement."

The prosecutor then attempted to show that the defendant was acquainted with another convict named "Charlie Whoppy." In the colloquy which followed, the prosecutor, in an attempt to justify going into these matters, stated that it was a misdemeanor to associate with criminals. Tomaiolo's counsel took immediate exception to this pointing out

among other things that the prosecutor as a former Assistant District Attorney of Kings County should have known better. After a ten minute recess, requested by the prosecutor, and a discussion before the Court off the record, the Court ended this line of examination by merely stating that under the New York Penal Law (McK.Consol.Laws, c. 40) associating with people who have a criminal record is not a crime or a misdemeanor. No instruction was given at this time or in the Court's charge to the effect that this evidence regarding association with criminals should be entirely disregarded. The District Judge merely said in a supplemental charge: "These alleged violations of parole regulations * * * may not be considered as affecting [Tomaiolo's] credibility * * *" Of course this implied that this testimony did have some relevance, and it may well have aggravated the damage to the defendant.

■ The evidence about breaches of alleged prison discipline, about friendships with people with prison records, and about alleged parole violations should not have been admitted.

■ It was of course proper for the government to inquire into the defendant's relationship with Louis Soviero and to develop the defendant's acquaintance with the Soviero family to show that he must have known Louis at the time of the robbery. The defendant admitted knowing Vincent Soviero. But no proper purpose was served by bringing out the fact that Vincent Soviero had a criminal record, for it was not necessary to do so to establish their acquaintance. Moreover, the prosecutor led into this subject by inquiring whether the defendant had met Vincent Soviero when he was in prison. This was unnecessary and it was most prejudicial to defendant Tomaiolo as it was followed by other questions designed to show that he kept company with persons who he knew had been convicted of crime. That he kept such company was not relevant on the question of Charles Tomaiolo's credibility. It was not a crime.

■ Even if keeping such company was a violation of the terms of the defendant's parole, such a violation was not an offense relevant to his credibility. Cf. United States v. Provoo, 2 Cir., 1954, 215 F.2d 531, 536; Henderson v. United States, 6 Cir., 1953, 202 F.2d 400, 405.

• The government now argues, however, that Tomaiolo by reason of the reference to his parole in the opening statement of his attorney and by his own supporting testimony, had in effect put his character in issue and that the cross-examination regarding parole violations was therefore permissible.

■ But it is clear that the opening statement of counsel for the defendant could not have put the defendant's character in issue. Such a statement has no evidentiary value, and therefore does not call for or justify cross-examination or rebuttal evidence. An instruction from the Court or argument of counsel is sufficient correction, not the introduction of otherwise inadmissible evidence.

■■ Nor did the defendant by testifying put his general character in issue. By taking the stand the defendant elected to be treated as any other witness, *viz.* he laid his credibility open to attack. Although a prosecutor may bring in evidence as to the truth and veracity of a defendant upon cross-examination, he is not at liberty to attack his general character. The general character of a defendant is put in issue only when he calls witnesses to testify to his reputation in general. Michelson v. United States, 1948, 335 U.S. 469, 476 et seq., 69 S.Ct. 213, 93 L.Ed. 168; Richardson, Evidence § 154 (8th Ed. 1955 Prince). The testimony of the defendant about his parole, and the circumstances thereof, did not "open the door" for the prosecutor's questions. United States v. Provoo, supra, 215 F.2d at page 535. In the Provoo case, we held that cross-examination regarding the defendant's confinements in army stockades and hospitals, which the government brought out were due to his homosexual aberrations, constituted reversible error, even

though on direct examination the defendant virtually told his life story including the fact of these confinements.

For the same reasons, questions regarding offenses against prison discipline during the defendant's nine year incarceration from 1941 to 1950, for which there had obviously been no separate conviction, and which were not felonies or crimes involving moral turpitude, should not have been permitted.

■ Fifth. Further along the prosecutor attempted to elicit from the defendant what he had told his counsel and his wife and when he had first made disclosures to them particularly with respect to where he was on November 29. These questions were pressed to the point of compelling the defendant's counsel several times to advise the defendant that these were privileged communications, thus making it appear to the jury that evidence which might be damaging was being kept from them. By repeatedly asking these questions before the jury and attempting to place the defendant in a false light by compelling him to claim the husband-wife and the attorney-client privileges, the prosecutor deliberately and improperly prejudiced the defendant's position. It was error for the District Court to permit such repeated questioning and colloquy before the jury.

Lastly, the prosecutor in the course of inquiring into why an automobile had been registered in the name of the defendant's wife, inquired into and pressed questions regarding the nature of family troubles of the defendant's brother-in-law. Although counsel objected on the ground that family trouble of a brother-in-law was going somewhat far afield, the Court overruled the objection and permitted further questions. While this was probably so meaningless as to be innocuous it shows how far into irrelevancy the prosecutor was permitted to roam.

■ In summary, by receiving this mass of inadmissible, irrelevant and highly prejudicial testimony, the District Court permitted the prosecution to paint the defendant Tomaiolo as a bad man, associating with criminal companions, who would do most anything. The accumulation of these errors made it impossible for the jury to limit its consideration to the charges for which Tomaiolo was being tried, and, in sum, they constitute reversible error.

B. The impeachment of Nicholas Tomaiolo

To bolster his defense, Charles Tomaiolo also called his brother, Nicholas, who testified that he had never lent his car to Nirenberg and that neither Mrs. Katz nor Nirenberg had ever been to his home. The importance of Nicholas Tomaiolo's testimony is obvious. Had the jury believed Nicholas Tomaiolo, they would have had to reject some of the testimony of Pauline Katz, the most important government witness linking Charles Tomaiolo with the robbery and identifying him as Nirenberg's confederate, as well as the testimony of Mrs. Jennings. We find that the government's attempts to impeach Nicholas Tomaiolo were improper in two aspects.

1. The grand jury testimony

■ Over two months after his brother and the others had been indicted, a period during which the FBI had repeatedly and unsuccessfully sought signed statements from Nicholas Tomaiolo as to the identification of the defendants and Nirenberg, and the alleged loan of his car, Nicholas Tomaiolo was called before the grand jury. On the advice of counsel, who was also counsel for his brother Charles, he refused to answer the questions noted in the margin on the grounds of possible self-incrimination.[1]

1. The testimony of Nicholas Tomaiolo before the grand jury was:
 "Q. Mr. Tomaiolo, are you acquainted with Charles Tomaiolo? A. Mr.

Windels, I refuse to make any answers that might incriminate me.
 "Mr. Tomaiolo, I intend to question you about the robbery of the Brentwood Long Island Branch of the State Bank

At trial, however, Nicholas Tomaiolo testified freely. His story in no way incriminated him; on the contrary he claimed to be innocent of any wrongdoing. On cross-examination the government was allowed, over objection, to bring out that he had refused to testify about the robbery before the grand jury. The government presents two arguments in support of the introduction of the witness' refusal to testify, neither of which we find tenable.

The government first argues that because Nicholas Tomaiolo's testimony at the trial did not incriminate him but rather pointed only to innocence, the prior refusal to testify on grounds of self-incrimination was inconsistent with this, and that this alleged inconsistency may be pointed out to attack Nicholas Tomaiolo's credibility.

Although at first glance, this argument seems not unreasonable, the recent decision of Grunewald v. United States, 1957, 353 U.S. 391, 415–424, 77 S.Ct. 963, 1 L.Ed.2d 931, stresses that such claims of inconsistency are not to be lightly accepted. Insofar as guilt or innocence is concerned, it is clear that claiming the privilege does not imply any guilt which would be at all inconsistent with later protestations or indications of innocence. Grunewald v. United States, 353 U.S. at page 421, 77 S.Ct. at page 982; Ullmann v. United States, 1956, 350 U.S. 422, 426, 76 S.Ct. 497, 100 L.Ed. 511. See also Slochower v. Board of Higher Education, 1956, 350 U.S. 551, 557–558, 76 S.Ct. 637, 100 L.Ed. 692. Insofar as the prior blanket claim of possible incrimination as to all questions is asserted to be inconsistent with subsequent non-incriminatory testimony, it seems to us that in the circumstances of this case, there was no real inconsistency.

Nicholas Tomaiolo was called before the grand jury as the brother of a man already indicted for robbery and as a person who knew he might be implicated to some extent. The FBI had sought statements from him regarding his acquaintance with Nirenberg, Charles Tomaiolo and Mrs. Katz, and about whether he had loaned his car to them on the day of the robbery. With that background, a reasonable choice was to refuse to testify in a grand jury proceeding where he

"* * * was a compelled, and not a voluntary, witness; where he was not represented by counsel; where he could summon no witnesses; and where he had no opportunity to cross-examine witnesses testifying against him. These factors are crucial in weighing whether a plea of the privilege is inconsistent with later exculpatory testimony on the same questions, for the nature of the tribunal which subjects the witness to questioning bears heavily on what inferences can be drawn from a plea * * * Innocent men are more likely to plead the privilege in secret proceedings, where they testify without advice of counsel and without opportunity for cross-examination, than in open court proceedings, where cross-examination and judicially supervised procedure provide safeguards for the establishing of the whole, as against the possibility of merely partial, truth." Grunewald v. United States, 353 U.S. at pages 422–423, 77 S.Ct. at page 983.

Moreover, where a witness has a reasonable belief that he may be a defendant himself, which belief Nicholas Tomaiolo could justifiably have entertained, it is perfectly consistent with innocence and with nonincriminatory answers to particular questions to refuse to answer any question at all. Id., 353 U.S. at page 423, 77 S.Ct. at page 983.

of Suffolk on November 29, 1955. Will you answer any questions in connection with the matter? A. I refuse to answer on the ground that it might incriminate me.

"Q. Will you answer any questions at all about that robbery? A. I refuse to answer any questions at all.

"Q. And the basis for your refusal is that your answers may tend to incriminate you, is that right? A. That is right."

Thus, we conclude that the fear of incrimination before the grand jury was quite understandable and that the non-incriminatory responses to the particular questions asked at the trial were not inconsistent with the claim.

On the other hand, the introduction of this evidence was bound to affect adversely the jury's estimate of Nicholas Tomaiolo's credibility. Introducing the grand jury testimony would almost certainly lead the jury to think that Nicholas Tomaiolo claimed the privilege before the grand jury because he was somehow connected with the robbery, for that is the almost inevitable result of the claim of the Fifth Amendment. Since the only alleged connection presented to them was the loan of his car and its return to his house after the robbery,[2] the jury was led to believe that he must have been lying at the trial when he denied those allegations. But, as noted, given the background of the investigations by the grand jury and the FBI, his refusal to answer any questions before the grand jury was understandable even though he may have had no connection at all with the robbery. It thus seems to us that "in the particular circumstances of this case the cross-examination should have been excluded because the probative value on the issue of * * * credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury." Grunewald v. United States, 353 U.S. at page 420, 77 S.Ct. at page 982, especially in view of the importance of this witness to the defense, and the fact that he was the defendant's brother.

The government's other contention is that, assuming Nicholas was innocent of wrongdoing, his claim of privilege in the grand jury was a wanton misuse of the privilege and that such an abuse may be shown at trial as an attack on the witness' credibility.

But this argument implies that every innocent man who exercises the privilege abuses it. There is no basis for such an assumption in law or in common sense, Grunewald v. U. S., supra, and in the circumstances of his appearance before the grand jury it is clear that Nicholas Tomaiolo's claim of privilege was not frivolous or in bad faith.

### 2. Cross-examination regarding court-martial convictions

On direct examination Nicholas Tomaiola testified that he had served in the Army for three years, had received an honorable discharge, and had purchased a home on a G. I. mortgage. On cross-examination the government was permitted to bring out, over objection, that he was twice sentenced to six months for being A.W.O.L. and he twice suffered loss of pay for the same offense. The government contends that the direct examination opened the door for an exploration of the witness' Army record on the issue of his credibility.

This line of cross-examination was not relevant to what the witness had stated about his Army service and his honorable discharge for it was not inconsistent with anything either stated or implied. Nor is such a breach of military discipline either a felony or a crime involving moral turpitude, see Henderson v. United States, supra, and these are the only types of offense which may be used for general attacks on credibility.

It was therefore error to allow the cross-examination concerning the court martial convictions.

### C. The removal of the trial to Mrs. Jennings' home

The appellants both complain of the removal of the trial on October 23, 1956 to Central Islip, Long Island, 60 miles from the court house, to take the testimony of Mrs. Patricia Jennings at her home.

The trial commenced on October 3, 1956. On October 16, before the government had rested its case, the prosecution for the first time informed the Court and

---

**2.** Louis Soviero told the FBI that Nicholas Tomaiolo had received $5,000 for the use of his car. This was known to the agents when they questioned Nicholas Tomaiolo.

defense counsel of the fact that the doctor of the government witness, Mrs. Patricia Jennings, was of the opinion that her pregnancy made it dangerous for her to travel to court. The prosecutor asked to have the Court adjourned to her home on the next day. Counsel for the defendants objected. It so happened that Maurice Edelbaum, counsel for Charles Tomaiolo, was home ill and he voiced his objection in a telephone talk with an associate.

The next morning, October 17, the prosecutor withdrew his request as the doctor had informed him that the birth was imminent. He stated that he wished to reserve the government's right to make the motion at a later time. Mr. Edelbaum objected to the procedure, stating that the government should have made an application to adjourn the trial if there was some uncertainty as to its ability to produce this witness.

On October 22 the prosecutor renewed his motion to take Mrs. Jennings' testimony at her home. He then offered in evidence a subpoena which had been served on her on September 27 returnable on October 1. He also produced an affidavit executed by Dr. Charles M. Labozzetta, which is dated October 19. Dr. Labozzetta's affidavit stated that the birth of Mrs. Jennings' child, which he had originally expected about August 8, 1956, was "extremely imminent." The affidavit stated in part:

> "In view of this situation, and further complications now existing, it is my opinion that it would be dangerous for the said Patricia Jennings to be required to travel to the Federal Court House in Brooklyn.

> "I can see no objection to the patient giving testimony in this case if she is not required to travel."

Over objections of counsel for the defendants, the District Court granted the motion to convene the Court the next morning at the Jennings home in Central Islip. For that purpose the jury first met in the usual courtroom in Brooklyn at 10:05 A.M. and the District Judge thereupon adjourned the session to Mrs. Jennings' home. The marshals transported the jurors and the other participants, including the defendants, to the Jennings home. Court reconvened in the basement of the Jennings home at 12:20 P.M. Dr. Charles Labozzetta was first called and was examined before the jury, the defendants not objecting to this course. The doctor reiterated what he had said in his affidavit and stated that it was his opinion on October 17, when he had discussed the matter with the prosecutor, that it would be dangerous for Mrs. Jennings to travel to Brooklyn and that that was still his opinion. The doctor did not testify as to why it would be dangerous nor did he state whether it would have been dangerous for Mrs. Jennings to go to Brooklyn prior to October 17. Mrs. Jennings' testimony was then taken.

Under 28 U.S.C.A. § 141 the Court is given wide discretion to move the place of trial to such places in the district "as the nature of the business may require." If the Court finds, upon proper application, that it is in the interest of justice to move the trial in order to take testimony which is relevant to the issues, that is sufficient. United States v. Haderlein, D.C.N.D.Ill.1953, 118 F.Supp. 346. While the showing made by the government is somewhat inconclusive on the question of why it would have been dangerous for Mrs. Jennings to travel to Brooklyn sometime before October 17 during the first two weeks of the trial, we think that it cannot be said that the removal of the trial was an abuse of discretion.

In any event it is difficult to see how the defendants were prejudiced. Their counsel examined Mrs. Jennings fully and freely. While the basement of a private home does not provide all the usual courtroom conveniences, there was no showing that the defendants or their counsel suffered from any lack of privacy or any disability. The quarters were necessarily somewhat cramped but there is no showing that the public was excluded and at least one member of it, in

the person of a representative of the press, was present.

At the same time, while we cannot say that the judge abused his discretion in this instance, we wish to point out that such an extraordinary course should be followed only in cases of real emergency and every inquiry to test the necessity should be made in advance by the Court. Here it would have been advisable to require a showing to be made sooner, and to make the doctor available to the Court and to the defense for examination in Brooklyn before moving the Court to a distant point. To decide such a question belatedly on the mere assertions of the prosecutor and an inadequate affidavit of the attending physician does not seem a prudent course to follow.

D. The prosecutor's summation.

We come now to the last substantial allegation of error made by the appellant Tomaiolo. During the cross-examination of Mrs. Katz the attorney for Soviero brought out that she had talked with Maurice Edelbaum, Tomaiolo's attorney, prior to appearing before the grand jury. On cross-examination by Mr. Edelbaum, Mrs. Katz told how she had only spoken to Mr. Edelbaum for a few minutes and that he had refused to advise her.

In his summation the prosecutor picked out this testimony and commented:

"After she got back and after she had given a statement to the FBI she got in touch with Mr. Edelbaum. She had an interview with Mr. Edelbaum at her request.

"Mr. Edelbaum is an ethical lawyer. I would say his reputation is the finest.

"Mr. Edelbaum had an interview with her and she told him about the statement that she had made. Mr. Edelbaum then said to her that he couldn't represent her because he

represented Charlie Tomaiolo and he only spoke to her for about 4 or 5 minutes.

"Now, Gentlemen, you are not to leave your good hard common sense at home when you sit here in the jury-box. If she had told him anyone in the world other than Charlie Tomaiolo had committed this robbery, do you think he would have only spent 3 or 4 minutes with her? He would have been so tickled to get this, to hear this, to get all the evidence he needed in this situation he would have been there for an hour.

"Why did he only spend 3 or 4 minutes with her?

"Why did he turn her down, because he was representing Charlie Tomaiolo."

The District Court erred in overruling the defense objection to such a flagrant distortion of the record. The Court should have promptly reprimanded the prosecutor, and should have instructed the jury to disregard the argument. More than that, the Court should have stated then or in the charge to the jury that there was no basis whatsoever for counsel's argument.

It was entirely proper for Mr. Edelbaum to talk with Mrs. Katz, as she requested. It was likewise proper to advise her to be counseled by someone other than himself. Indeed that was the best course for counsel to follow. These matters are difficult for laymen and jurors to understand.

No adverse inference could or should have been drawn from the facts regarding Mr. Edelbaum's brief talk with Mrs. Katz. It was inexcusable for the prosecutor to make such a charge. It was a violation of his duty to see that defendants on trial for a most serious felony were accorded a fair trial.[3] More than that, the position of the prosecutor as one who presumably would be knowledgeable about such matters gave such undue

---

3. In view of our remarks about the conduct of the prosecutor, it should be noted that none of the government representatives on this appeal, or named in this opinion, participated in the trial of this case.

and unfair emphasis to his argument that it could be corrected only by an immediate rebuke and a careful instruction from the District Judge and his failure to correct this grossly improper argument was error. Steele v. United States, 5 Cir., 1955, 222 F.2d 628, 631.

We do not hold that any one of the errors which we have found to have been committed with respect to the defendant Charles Tomaiolo necessarily requires reversal. But in view of the serious nature of these errors, and their number, we must reverse Charles Tomaiolo's conviction.

## II. Errors as to the defendant Louis Soviero

As appears from the statement of facts at the begining of this opinion, there was much evidence of Soviero's guilt, in addition to his admissions to the arresting FBI agents. He entered no defense nor did he take the stand, but because of the errors in the admission of evidence and the conduct of the case against him, we must reverse his conviction.

Two of the special agents of the Federal Bureau of Investigation, who arrested Soviero in Buffalo, testified at trial. They told how Soviero had admitted his knowledge of the conspiracy and the secretion of the machine gun, but that he refused to sign a statement to that effect. One of the agents, when asked by the prosecutor what the reason was for his refusal, replied that "he stated that he would rather wait until he got down to New York City and see his parole officer." No objection was made to this testimony at this time, but 12 days later, after Soviero's attorney had an opportunity to read the transcript, a motion for mistrial was made because of this allusion to Soviero's criminal record. The motion was denied. In view of the long delay in objecting it was not error for the District Court to deny the motion for a mistrial based solely on this one incident. But as this error was compounded by what followed, we cannot disregard this reference to the defendant Soviero's criminal record.

As we have already noted, later during the cross-examination of Charles Tomaiolo, the prosecutor elicited testimony that Tomaiolo had known the appellant's brother, Vincent Soviero, when they were both in prison. Tomaiolo admitted further that he had visited Vincent Soviero at his home after they both had been released. The prosecutor at this point was trying to show the parole violations of the appellant Tomaiolo. For the reasons stated above, the entire line of questioning was objectionable.

It had already appeared at this point that Louis Soviero lived at his brother's home, and when the prosecutor asked Tomaiolo whether he had met Louis Soviero at his brother's home on any of these visits, Tomaiolo first responded "Sir, I—you want me to answer that question?" The prosecutor pressed his question and finally the answer he got was that Louis Soviero "was in prison at the time."

Soviero immediately moved for the declaration of a mistrial but the motion was immediately overruled. The prosecutor thereupon said "I ask the jury to disregard the last statement" whereupon the trial judge repeated the thought: "Yes. Disregard the last statement." We think that this was inadequate and the absence of sufficient instruction constitutes error.

■ Soviero's character was not in issue nor was his credibility open to attack. United States v. Modern Reed & Rattan Co., 2 Cir., 1947, 159 F.2d 656. The fact that he had been in prison was irrelevant and incompetent. This testimony indicating a criminal record could only serve to prejudice the jury. It made a fair and impartial trial impossible. Although the jury was advised to disregard the statement, that could not have erased from their minds its prejudicial effect.

And it is fairly apparent that the prosecutor knew that the answers to his questions would reveal Soviero's criminal past. Certainly the special agents of the FBI had already advised him, out of

court, of the reason why Soviero refused to sign the statement.

Nor may Tomaiolo's testimony be classed as purely voluntary. Even if he did not have actual knowledge of the times during which Louis Soviero was in prison, the prosecutor had the means of gaining such information. Yet he pressed the reluctant Tomaiolo to answer. In fact, as we have noted already, this entire line of questioning about Tomaiolo's parole violations and associations with persons with criminal records was in error. That Soviero's criminal past also came out was but one more of the fruits of the forbidden tree. Cf. McDonald v. United States, 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153.

The government states in its brief that Tomaiolo's statement "appears to be a designed falsehood." We do not see how any weight can be given to this statement as Judge Medina does in his dissent, as there is no support whatsoever for it in the record.

 Although the errors with respect to Soviero are far less serious than those with respect to Tomaiolo, since they were tried together we must give some weight to the obvious fact that anyone tried with Tomaiolo could not help but suffer in the eyes of the jury because of the unfairness with which the trial against him was conducted.

Furthermore, the atmosphere of criminal associations and unlawful activities which the government was erroneously permitted to develop and emphasize with respect to Tomaiolo did in fact include Vincent Soviero, Louis' brother, as well as Louis Soviero himself. On this record it is impossible to say that all of this did not substantially and erroneously prejudice Soviero's defense. Where co-defendant Tomaiolo received such an unfair trial we must give that factor due weight in determining whether that fact together with the errors committed with respect to Soviero require reversal. We conclude that on this record Soviero was seriously prejudiced by the whole trial, even that part of it which particularly

pertained to Tomaiolo, and that his conviction should accordingly be reversed.

Where errors as to one defendant are so substantial and of such nature as to affect a co-defendant with whom he is tried jointly, appellate courts have reversed the convictions of both defendants on trial where it seemed that they could not have been fairly tried. United States v. Thomson, 7 Cir., 1940, 113 F.2d 643, 129 A.L.R. 1291; Feder v. United States, 2 Cir., 1919, 257 F. 694, 5 A.L.R. 370; Smith v. United States, 6 Cir., 1956, 230 F.2d 935; Nelson v. United States, 1953, 93 U.S.App.D.C. 14, 208 F.2d 505; Duncan v. United States, 7 Cir., 1928, 23 F.2d 3.

While other assignments of error have been made by the appellants, those already discussed require reversal and we do not think that the remainder merit comment.

 We note, however, that there was a merger into one substantive crime of two of the counts for which each defendant was convicted. Thus, as we pointed out in the Nirenberg appeal, 2 Cir., 242 F.2d 632, certiorari denied, 1957, 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed. 2d 1539 the count charging bank robbery and the count charging the defendant Tomaiolo with endangering the lives of the bank employees during the robbery merge into one substantive crime, for which only one sentence could be imposed. Likewise, the count charging Soviero with aiding and abetting the robbery merges with the count charging him with being an accessory after the fact. Hence it was improper to impose separate sentences on counts 2 and 3 as to Tomaiolo, and counts 2 and 4 as to Soviero.

The government's case against both defendants, if the jury credited Mrs. Katz's testimony, as it must have, was very strong. Despite this we find the errors here committed to be of such serious nature and so numerous that it is clear that both defendants were seriously prejudiced and that they could not have received that fair trial to which all defendants are entitled regardless of

their criminal records, their station in life or the heinous nature of the offense with which they are charged.

The judgments of conviction are reversed and the case is remanded to the District Court.

We take this opportunity to express our appreciation to Marvin Schwartz and Andrew N. Heine for their services as assigned counsel for the appellant Louis Soviero.

MEDINA, Circuit Judge (dissenting).

I dissent and would affirm the judgments of conviction of both Soviero and Tomaiolo.

In the early afternoon of November 29, 1955 two men entered a branch of the State Bank of Suffolk, a small bungalow-type building surrounded by a clump of trees in Brentwood on Long Island, New York. One of them, wearing rubber gloves, with a submachine gun in one hand, held the other hand over the upper part of his face. His cap was drawn down over his forehead, but his eyes, eyebrows and part of his hair as well as the contour of his face were visible. The other and taller man, armed with a revolver, forced the manager of the bank to lie down on the floor in the conference room behind the tellers' cage and took possession of what currency he could find in the safe, while the man with the submachine gun forced one of the tellers to fill a bag with the money in the drawer under her teller's window. The two tellers and a customer who arrived while the robbery was in progress were herded into the conference room; and the robbers left with $35,033 in currency and travellers' checks in the amount of $6,290. The man with the revolver was Abraham Nirenberg, who was tried separately, and we have already affirmed the judgment of his conviction. United States v. Nirenberg, 2 Cir., 242 F.2d 632, certiorari denied 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539. Despite his attempt to cover his face, the identification of the man with the submachine gun as gun as appellant Charles Tomaiolo

was satisfactory, adequate and convincing.

Pauline Katz, who was living with Nirenberg at the time of the robbery and who was with him and appellant Louis Soviero when they were arrested in Buffalo, New York, on February 12, 1956, testified as a Government witness, and she related with a wealth of detail the circumstances under which the robbery was planned and consummated.

In barest outline, Louis Soviero was to steal a car to be used for the getaway; three men, Nirenberg, Tomaiolo and Soviero, were to enter the bank, intimidate the employees and take whatever money they could lay their hands on. After making their escape they were to abandon the getaway car at an appointed place and shift over to Charles Tomaiolo's Oldsmobile and drive off with the loot. Louis Soviero did provide the stolen car, but at the last moment he refused to go with the others, although he consented to their use of the stolen car provided by him. It was decided to procure a submachine gun to afford the protection which would otherwise have been furnished by the presence of a third confederate, and Monday, November 28, 1955 was devoted to the purchase of the submachine gun. On the morning of November 29, 1955 Louis Soviero still refused to go and the conspirators, accompanied by Pauline Katz, left the Tomaiolo home in Brooklyn and started for Brentwood, Pauline and Nirenberg, who also went by the names of Newman, Sherman and Simon, in the stolen car, a black Buick, and appellant Tomaiolo in his Oldsmobile. Tomaiolo thought the Oldsmobile, which had recently been repaired, was not running as well as it should, and so they all decided on the spur of the moment to go and borrow the car of Nicholas Tomaiolo, the brother of appellant Charles Tomaiolo, who lived and had his place of business not far away. Nirenberg went off and in ten or fifteen minutes came back with a blue Plymouth belonging to Nicholas Tomaiolo.

So Pauline, Nirenberg and Charles Tomaiolo, using the black Buick and the blue Plymouth, started toward the bank. At a place made inconspicuous by the surrounding trees and bushes Pauline was left in the blue Plymouth. The others proceeded to the bank, consummated the robbery and returned. The men changed their clothes, transferred the loot to the Plymouth and backed the Buick far into the bushes preparatory to their departure to the house of Nicholas, where Nirenberg and Charles Tomaiolo went down to the basement and wrapped the stolen currency in Christmas packages. This, less some distributions to Soviero and to the young men who helped steal the Buick, was divided 50-50 between Nirenberg and Charles Tomaiolo.

When they tried to take the license plate from the rear of the Buick they discovered to their dismay that it was bolted on with rivets and they had no tools to remove it. The license plate bore the number QQ 6991; and this proved the undoing of both appellants, as the various circumstances which the ensuing investigation revealed demonstrate beyond peradventure of doubt the guilt of both appellants and lend such corroboration to the testimony of Pauline Katz that I am quite convinced that no jury qualified to serve in that capacity could have arrived at any verdict other than the one rendered in this case.

As will appear in a later portion of this opinion, I find no error in any of the rulings of the trial judge, and his charge not only covered every legal phase of the case with unexceptionable accuracy but it was also a model of brevity, a quality much to be desired and all too seldom come across.

Not long after the robbery Louis Soviero thought it best to run away. This he did in the company of Pauline Katz and Nirenberg. Their travels took them to Kentucky and to Florida; they returned and again followed much the same route. On February 12, 1956 the FBI caught up with them in Buffalo, where the submachine gun used in the robbery and a number of revolvers were found in Nirenberg's Cadillac car, in which the trio had been touring the country. In his statement to the FBI agents Soviero denied that he had had any part in the planning of the bank robbery or in the robbery itself, but he admitted that the submachine gun found in Nirenberg's car was the one used in the robbery, and he described in some detail the leaving of the machine gun with Salvatore Catapano, who later pleaded guilty to the charge of being an accessory after the fact, and its removal to the trunk of the Cadillac. It is impossible to read this statement, which Louis Soviero said was accurate but refused to sign, without an abiding conviction that the man who made it knew of the plans of the conspirators and participated to some extent in carrying them out. The admission most damaging to Soviero in the light of what was later discovered, was Soviero's statement that he was told "about two days after the bank robbery * * * something happened, we used your brother's plate and it may come back to you, we didn't have a chance to take it off." Testimony to the same effect was given by Pauline Katz.

Of course, if Soviero furnished the stolen car to be used in the robbery, and participated in the concealment of the submachine gun, he was guilty of conspiracy, of aiding and abetting and of being an accessory after the fact to the robbery, as charged.

Where did license number QQ 6991 come from? How was it connected with appellant Soviero?

Frank Labocetta was a nephew of appellant Soviero, and he had a friend named Vincent Boccia. Labocetta testified that on November 25, 1955 his uncle asked him if he wanted "to make a couple of bucks" by picking up a car "for a friend of his." Soviero described the black Buick that was later used in the robbery, told his nephew where it was and gave him the keys. The two boys found the car drove it back and parked it in front of Soviero's house. The next morning Labocetta was given a license

plate by Soviero and he bolted it in on the Buick. Had he tied it on with string the perpetrators of the robbery might never have been discovered. Soviero gave Labocetta $150, or $75 for each of the two boys, as compensation for their services. Soviero received additional moneys on his own behalf from Nirenberg, some of it in an envelope wrapped up in a skirt and delivered to him by Pauline Katz.

Francis E. Hodge, the owner of the black Buick, identified the car and testified that he had parked it in front of his home and that it was stolen on the night of November 25, 1955. His license plate, CK 8041, was found inside the car after the robbery.

The trail led from license plate QQ 6991 back to appellant Soviero not only because he gave the plate to Labocetta with directions to put it on the car, but because it was a license plate owned by appellant's brother Vincent Soviero, who had registered a 1950 Plymouth under the fictitious name of "James Russo." There was no way open to the prosecution to prove the essential details connected with this 1950 Plymouth and the QQ 6991 license plate except by the testimony of Vincent Soviero's wife Jean and that of Vincent's parole officer Robert V. Sterzer. The testimony of both was relevant and significant and its probative force would have been weakened if not destroyed unless given in the context of Sterzer's relationship to Vincent. It is well settled in this Circuit that evidence otherwise material to the issues of a case is not to be excluded simply because it incidentally discloses conviction for crime. United States v. Chiarella, 2 Cir., 184 F.2d 903; Vause v. United States, 2 Cir., 53 F.2d 346.

The reason Vincent Soviero used the fictitious name "James Russo" was because, as a parolee, he was not permitted to drive a car without the consent of his parole officer. And he took the precaution to apply on March 15, 1955, the same day license QQ 6991 was issued to him, for a learner's permit under the name "James Russo."

Accordingly, Vincent Soviero was picked up by Sterzer on May 20, 1955, the license and the permit were found on his person and the use of the alias "James Russo" discovered. The parole officer then took the keys of the car and the license and permit and left them at Vincent's home in Brooklyn.

Jean Soviero filled in the remaining details. After Vincent was arrested and forced to give up the 1950 Plymouth, she proceeded to sell it with the assistance of her brother-in-law, appellant Louis Soviero. Accordingly, Louis Soviero took the 1950 Plymouth with the QQ license number, and, because of the fictitious name "James Russo," it was decided first to transfer the 1950 Plymouth to a cousin named Renato Voccia, which was done. Voccia then owned a 1938 Pontiac with license plate 9K4940, and this license plate was transferred to the 1950 Plymouth at the time of the transfer of that car to Voccia. Later, Voccia sold the 1950 Plymouth and gave the proceeds to Vincent's wife. Thus there was no further legitimate use for license plate QQ 6991, which Louis Soviero put away for future contingencies; and the occasion to use it arose when Hodge's black Buick was stolen preparatory to the robbery of the bank. To have left Hodge's plate on the car would have exposed the conspirators to the risk of arrest, as it was to be assumed that the owner of the stolen car would report his loss and the license number to the police.

It is against this background that the jury considered appellant Soviero's flight with Pauline Katz and Nirenberg; and it is not conceivable to me that the jury could have failed to find that he provided the getaway car according to his undertaking to do so for the purpose of the robbery, that he was paid for this out of the money stolen from the bank and that he participated actively in the concealment of the submachine gun used in the robbery. As to appellant Tomaiolo there was direct proof that it was he who, with a submachine gun in his hand, actually robbed the bank, accompanied by Nirenberg. And the web of circum-

stances surrounding the activities of these two appellants leaves in my mind no doubt whatever of their guilt.

I turn now to appellant Soviero's points. The contention that the evidence is insufficient to support the verdict against Soviero, as charged in Counts 1, 2 and 4 of the indictment, is nothing short of frivolous, as is apparent from the factual recital just given, from which many incriminating details have been omitted in the interest of brevity. Some of these details will be adverted to in connection with the discussion herein of the various law points. Indeed, to use the classic expression found in Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593, the "record fairly shrieks" the guilt of both appellants. Cf. United States v. Tramaglino, 2 Cir., 197 F.2d 928, 932; United States v. Raspovich, 2 Cir., 241 F.2d 779, 781; United States v. Chieppa, 2 Cir., 241 F.2d 635, 640; United States v. Apuzzo, 2 Cir., 245 F.2d 416.

The principal contention is that a motion by Soviero for a mistrial should have been granted because, on October 3, 1956, the first day of the trial, Frank J. Liddy, Jr., an FBI agent, in the course of his testimony relative to Soviero's authentication of the written statement containing a summary of the principal admissions made orally by Soviero, gave the following answers to the following questions:

"Q. What if anything did he say with respect thereto? * * * A. After reading the statement he stated that the contents therein were true and correct, however, he declined to sign it at this time.

"Q. Did he say why? A. He stated that he would rather wait until he got down to New York City and see his parole officer."

There was no objection to this question by Soviero's counsel, who at the time the answer was given made no motion to strike the answer or for any other relief. There followed considerable discussion concerning the deletion of various parts of Soviero's statement before receiving it in evidence against Soviero and reading it to the jury. In the course of this discussion the trial judge agreed to eliminate all references to Soviero's "previous record, convictions and parole," the most significant of which was Soviero's statement that, approximately two weeks after the bank robbery, he went to Nirenberg's home and "told him I decided to jump parole."

Having thus secured the advantage of the elimination of this damaging and perhaps admissible gloss on Soviero's flight, the undeleted portions of the statement were read to the jury and the trial proceeded.

Twelve days later, and after some 600 pages of testimony had been taken, counsel for Soviero moved for a mistrial on the basis of the answer given by Liddy, which I have already quoted.

I can find no basis for a ruling by us that it was an abuse of discretion to deny this motion. Had counsel objected to the question or moved to strike the answer there is no reason to doubt that a proper ruling would have been made, and such interim instructions given as the occasion required. I think it quite clear that the point was waived.

But the motion for a mistrial, though made in the absence of the jury, must have been known to appellant Tomaiolo, who took occasion to volunteer a statement, during his cross-examination later in the trial, which counsel, quite unfairly I think, attributes to overzeal and impropriety on the part of the prosecutor, rather than to the cunning of appellant Tomaiolo, who may well have thought he saw another opportunity to cause a mistrial and put off the evil day.

The prosecutor was questioning Charles Tomaiolo, who testified in his own defense although Soviero did not, on the subject of his acquaintance with appellant Louis Soviero. This was of significance as Tomaiolo had testified on direct examination that he met Louis Soviero for the first time at a New Year's Eve party, about a month after the robbery. In Soviero's statement to

the FBI Soviero had admitted that he met Nirenberg "prior to Thanksgiving of 1955," and that he knew Charles Tomaiolo "since prior to my meeting Nirenberg" as he "was a friend of my brother, Vincent Soviero." As the statement was read to the jury, however, the name "Mr. X" was substituted for Charles Tomaiolo, as was quite proper.

In the course of the cross-examination the relationship between appellant Tomaiolo and Vincent Soviero was developed with some success and it appeared that appellant Tomaiolo had visited repeatedly at Vincent's home, 325 Linwood Street in Brooklyn. The entire incident now relied upon for reversal appears in the following quotation from the transcript:

"Q. So that you spent a half hour or an hour on these occasions? A. Yes.

"Q. How often would you say that happened? A. Every couple of weeks, maybe a month.

"Q. About how many times all together? A. A dozen, maybe.

"Q. About twelve to eighteen times? A. Yes, sir.

"Q. Don't you know that that's where Louis Soviero lived? A. Sir, I—you want me to answer that question?

"Q. Yes or no.

"Mr. Sabbatino: There he goes again, your Honor.

"A. I presume he lives there.

"Q. You heard testimony here that that's where he lived?

"Mr. Edelbaum: That doesn't make it so.

"The Court: Yes. That doesn't make it so. You are asking him if he knew before this trial.

"Q. Didn't you know before this trial that that's where he lived? A. I imagined he lived there.

"Q. Did you meet any other members of the Soviero family there besides Jean and Vincent? A.

Yes, sir; I met Charlie and his sister.

"Q. So you met Charlie there and you met his sister there, and you met Vincent there, but you never met Louis there? A. Sir, he was in prison at the time."

This last answer was in my judgment not only clearly not responsive to the question propounded to the witness, it was also unexpected and not to be anticipated by the prosecutor. In the Government brief it is characterized as "a designed falsehood," and I see no reason to doubt that this is so. Undoubtedly appellant Soviero had been convicted of crime as his statement to the FBI reveals, but there is ample in this record to show that he had his freedom and had opportunity to visit with appellant Tomaiolo at Vincent's home. In other words, that he was not in jail as appellant Tomaiolo said he was. In any event, the trial judge directed the jury to disregard the statement complained of; and, in my judgment, it was quite proper for the trial judge to deny the motion for a mistrial which Soviero's counsel promptly made. If we were to hold a mistrial mandatory under such circumstances we would, to paraphrase the suggestion made by Chief Judge Clark in his opinion in United States v. Apuzzo, 2 Cir., 245 F.2d 416, 422, place in the hands of shrewd defendants or defense witnesses an unjustifiable tactic for obtaining mistrials or reversing fair convictions of guilty men.

Parenthetically, it is interesting to note that, only a few moments before the incident now under discussion, counsel for appellant Soviero inadvertently let the cat out of the bag and himself informed the jury that Soviero had been at one time in Auburn State Prison with appellant Tomaiolo.

The cross-examiner was inquiring of Charles Tomaiolo whether Nirenberg had been in Auburn State Prison with him and the answer was yes. Then the following occurred:

"Q. Was Vincent Soviero there with you too? A. Yes, sir; he was in Auburn State Prison.

"Mr. Sabbatino: I move for a mistrial on the ground that the United States Attorney has brought out that my client has a record.

"Mr. Gliedman: Vincent Soviero.

"Mr. Sabbatino: I am sorry, I thought * * *.

"Mr. Gliedman: Do you withdraw your application?

"Mr. Sabbatino: Yes, I withdraw it; I misunderstood him * * *."

Appellant Soviero urges us to hold that the testimony of the witness Eileen Calvo, which was received against Soviero alone, was given as a result of "extortion" by the trial judge, who overruled Calvo's claim of constitutional privilege to refuse to answer. The witness lived with Catapano and her testimony corroborated many of the admissions in Soviero's statement to the FBI about the hiding of the submachine gun. She saw appellant Soviero, together with Nirenberg and another man in the Catapano apartment on February 10, 1956; she described a package about the size of the submachine gun; and she identified the bag or pillow case in which the submachine gun was found in Nirenberg's car at the time of the arrest in Buffalo on February 12, 1956.

As so often happens in cases of trial for bank robberies or other crimes of violence, witnesses are reluctant to testify for the prosecution, but they will do so if their testimony has all the appearance of being given because there is no alternative. Here I can find nothing in the record to indicate that the prosecutor expected Calvo to plead the Fifth Amendment. But when she was called as a witness she refused to be sworn or to answer any questions whatever on the ground of self-incrimination. After she had refused to answer a few questions, despite the direction of the trial judge that she do so, she said, "I think I want a lawyer." The trial judge accordingly assigned a Mr. Theodore Rosenberg, whose qualifications are not disputed, and the result of a conference between Mr. Rosenberg and the witness was that the witness said she would object to answering each question but that she would answer if the trial judge directed her to do so. Accordingly, she answered each of the questions put to her.

I find no error in the reception of this testimony. All of it was relevant to the issues. The prosecutor was not responsible for the reluctance of the witness to testify; nor has appellant Soviero any standing to argue the question whether or not Calvo's claim of constitutional privilege should have been sustained. It is well settled law that only the person whose constitutional rights are alleged to be violated may protest their infringement. This Circuit has held that even "where testimony is privileged, and the witness waives the privilege, or the court disregards it, the party against whom the evidence is used cannot complain of the error." Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 2 Cir., 32 F.2d 195, 202, certiorari denied 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629; Morgan v. Halberstadt, 2 Cir., 60 F. 592, certiorari denied 154 U.S. 511, 14 S.Ct. 1149, 38 L.Ed. 1078.

An entirely different situation arises where the prosecution calls a witness who steadfastly refuses to answer and the prosecutor knew that this would be the case. In such instances no relevant testimony is given but the jury is left with the impression that had the witness answered the questions the answers would have been favorable to the Government. But the proof that this was designedly done in bad faith by the prosecutor must be substantial and convincing. Here we have nothing whatever to indicate any such design. Moreover, the jury was not left to speculate on what the answers might or might not have been; for every question was answered.

My brothers have found what appears to them to be another questionable practice resorted to by the prosecutor, although it apparently did not seem so to counsel for appellants who made no point

of it. Here again I find no impropriety whatever. My brothers say questions were addressed to appellant Tomaiolo on cross-examination which called for matter privileged either because of the attorney and client relationship or because of the marital status. The inference is that the prosecutor knew the privilege would be asserted and hence should not have asked the questions. I say he could not have known that the privilege would not be waived and that the questions were in every way proper. As always the background is important.

Mrs. Margaret McGuirk, a sort of practical nurse, had been called to Charles Tomaiolo's apartment in November, 1955 to take care of Mrs. Jordan, the mother of Tomaiolo's wife, who had been confined to the hospital as a result of a stroke and had just come home. Mrs. McGuirk was very positive in her recollection of November 29, 1955 and testified that she was in the Tomaiolo home from 8:30 in the morning until 4:30 in the afternoon and saw appellant Tomaiolo there all this time on the couch or looking at television. She remembered this because it was the day she started to take care of Mrs. Jordan, and this was fixed in her mind because on the evening of November 28 she had come to the apartment for an interview with Mrs. Jordan's son John with respect to her employment as a practical nurse and had been kept waiting around for four hours before John could see her.

Mrs. Julia Hickey, an old friend of Tomaiolo's wife and her mother, was even more emphatic, indeed quite belligerent in her support of Tomaiolo's alibi.

One difficulty with this testimony, however, was that each of these witnesses admitted that no one had mentioned the subject of their presence in the apartment on the day of the robbery until a week before they testified, when, during the progress of the trial, they went to the office of Tomaiolo's lawyer and were questioned.

As soon as he was arrested on January 23, 1956, Charles Tomaiolo knew he was suspected of complicity in the robbery of the bank. On February 21, 1956 the indictment was handed down and the date of November 29, 1955 was stated as the date of the robbery. The trial commenced on October 3, 1956. If appellant Tomaiolo really was in his apartment on the day of the robbery, in the presence of Mrs. McGuirk and Mrs. Hickey, it is more than passing strange that neither Tomaiolo's lawyer nor his wife nor anyone else asked them long prior to the trial whether they remembered seeing Tomaiolo in the apartment that day.

Accordingly, it was not only proper but essential that the prosecutor ask Tomaiolo on cross-examination if he had told his lawyer and his wife about Mrs. McGuirk and Mrs. Hickey. Otherwise counsel for Tomaiolo in summation would doubtless have argued that he could not bring out the conversation on Tomaiolo's direct examination, as it was self-serving, but that the prosecutor could have pursued the subject had he chosen to inquire on cross-examination.

It is sheer unsupported assertion, I think, to say that the prosecutor knew in advance that the privilege would be asserted and that the questions would be objected to. On the contrary, it was more reasonable to expect that Tomaiolo would assert that he had told his lawyer and his wife, prior to the trial. As a matter of fact, that is precisely what he did at a later stage, after his counsel had made a show of indignation over the asking of the questions, had asserted Tomaiolo's privilege, and had his objections sustained. I find no impropriety here nor anything remotely suggesting the making of any erroneous ruling by the trial judge. United States v. Augustine, 3 Cir., 189 F.2d 587.

Parenthetically, it may be noted that the alibi was pretty well battered after Mrs. Jordan's attending physician, Dr. James A. Lynch, testified that Mrs. Jordan was discharged from the hospital on November 17 and that when he saw her at the Tomaiolo home on November 20 Mrs. McGuirk was there. He also saw Mrs. McGuirk there on the occasion of

his many other visits. So, according to this testimony, Mrs. McGuirk did not start work on November 29, as she claimed.

I now turn to the remaining points made in support of Tomaiolo's appeal or urged by both appellants as a basis for a reversal of the judgments of conviction.

Vigorous objection was made by both appellants to the conduct of part of the trial in the home of the prosecution witness Patricia Jennings, who lived in Central Islip, Long Island, and precisely across the street from the residence of Nicholas Tomaiolo. The unanticipated delay in the birth of Mrs. Jennings' child, all of which I think was explained in a satisfactory manner, made this unusual step entirely proper in the circumstances of this particular case. Certainly there is no basis for any claim of abuse of discretion. Counsel insists that this procedure "could have been avoided by a short adjournment of the trial." But this is far from clear to me; nor was any such suggestion made at the trial. The birth of the child was perhaps a matter of hours, or a day or two, but no one could predict when Mrs. Jennings would be in a condition to make the trip to Brooklyn to testify in court; and the trial had already taken three weeks.

The importance and relevancy of the testimony of Mrs. Jennings cannot be gainsaid. She saw Nirenberg and Louis Soviero and the black Buick at the home of Nicholas Tomaiolo on the evening of Sunday, November 27, 1955, and she saw the blue Plymouth drive up to the house of Nicholas Tomaiolo just a short time after the robbery on Tuesday afternoon, November 29, 1955, at which time she observed three persons get out and go in the house. The importance of this corroboration of the testimony of Pauline Katz needs no explanation, and there is more of it, which I omit for the sake of brevity.

The prosecutor showed that, because of Mrs. Jennings' physical condition, her testimony could best be taken in her home, and he made a timely application to the trial court for such a removal.

There is statutory authority for "Special terms of district court (to) be held at such places in the district as the nature of the business may require * * *." 28 U.S.C. § 141. In view of the importance of this witness's testimony and the circumstances which confined her to her home, there was clearly no abuse of discretion by the trial judge in ordering the removal. See United States v. Haderlein, D.C.N.D.Ill.1953, 118 F.Supp. 346.

In connection with this incident, and others to be discussed later, as with others already covered, it is claimed that the prosecutor acted in bad faith. But we are all familiar with the temptation, all too seldom resisted by defense counsel, to attack the prosecutor rather than to discuss the evidence. I can find nothing in this record which even remotely suggests that the prosecutor wilfully delayed calling Mrs. Jennings until it became necessary to close the case without the advantage to the Government of her testimony, or to adjourn the trial to her home. The explanation by Dr. Lobozzetta, including his testimony of his conferences with the prosecutor on the subject, is in my opinion entirely reasonable and satisfactory.

Another group of objections relate to the very successful efforts of the prosecutor to controvert evidence brought out by defense counsel. Those experienced in trial strategy are well aware of the fact that seasoned and resourceful lawyers such as those defending these appellants never open up a subject without a purpose. Often the subject matter seems of little significance, but it may lay a foundation for a plausible argument on summation or, more often, it may be done merely to sow seeds here and there which it is hoped will germinate and bear fruit covertly in the minds of the jurors. Whenever this is done, whenever defense counsel opens up a subject, the extent to which the other side may go by way of countervailing proof is matter for the discretion of the trial judge. McCormick, Evidence Section 57 (West Pub. Co. 1954 ed.); see Vause v. United States, 2 Cir., 53 F.2d 346, certiorari denied 284

U.S. 661, 52 S.Ct. 37, 76 L.Ed. 560; Cohen v. United States, 2 Cir., 157 F. 651; McBoyle v. United States, 10 Cir., 43 F. 2d 273, reversed on other grounds, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816; cf. Crawford v. United States, 91 U.S.App. D.C. 234, 198 F.2d 976. I cannot see any basis in this case for a ruling by us that there has been any abuse of the discretion thus exercised.

In his opening to the jury counsel for appellant Tomaiolo described how "when he was about twenty years of age" and "because of a brother-in-law who was desperately in need of funds for his wife" appellant "became involved in a robbery" and that "he admitted his guilt." Counsel went on to state how appellant Tomaiolo was paroled the first time he went before the Parole Board as "they in their discretion felt that he was a fit subject to go out and be rehabilitated." There is more about how he was supervised by his parole officer and became a longshoreman in which employment he had to be investigated by the Waterfront Commission, which issued him a card permitting him to go to work. There was more about his arrest and how a man could be put back in prison for violation of parole without any reason at all. The inferences from all this are inescapable: he at once pleaded guilty in connection with the first robbery and would have pleaded guilty here too had he robbed the Brentwood bank; that he was such a good prisoner that the Parole Board, after careful examination of his record, released him as soon as he was eligible for release; and that the Waterfront Commission, which was particularly alert to eliminate ex-convicts who were bad characters, and had, as counsel asserted, discharged "some sixteen hundred people with records," who "weren't allowed to work after being investigated," gave appellant Tomaiolo a clean bill of health as a result of its investigation and let him work on the docks. None of these matters had anything to do with the issues in this case, but defense counsel chose to introduce them.

On his direct examination appellant Tomaiolo testified to these matters as his counsel said he would. Indeed, when asked whether he had been convicted of the crime of robbery in the first degree in 1941, appellant, quite aware of the notion his counsel was trying to put in the minds of the jurors, insisted, "I wasn't convicted. I pleaded guilty." His testimony about the Parole Board and his relations with his parole officer, and the investigation by the Waterfront Commission followed the outline of his counsel's opening. And he threw in for good measure a pass issued to him by the Coast Guard.

Naturally the prosecutor, knowing the facts, could not be expected to remain silent and let appellant Tomaiolo get away with what he was trying to do. So, on cross-examination the details of the first robbery came out. Appellant Tomaiolo and others had robbed a candy store and earlier the same night a filling station, although Tomaiolo insisted he remained in the car while the others were holding up the filling station. The upshot was that the group of young desperadoes was pursued by the police and Tomaiolo was caught at pistol point, with a number of bullets in his pocket. So, the jury might infer, Tomaiolo pleaded guilty not on general principles of cooperating with the law enforcement agencies but because he was caught redhanded and had no possible defense.

On the same theory it was brought out on Tomaiolo's cross-examination that, far from being a model prisoner, he had been guilty of theft in prison, and had been placed in solitary confinement after a fight with another inmate. There was ample basis for his rearrest for violation of parole, as the New York State Parole Board rules were received in evidence and it appeared that appellant Tomaiolo had not only consorted with evil companions with criminal records, some of this having come out also on his direct examination, but had violated the rules in many other respects, such as driving a car without permission. Gambling was

another of these; and Tomaiolo was in the uncomfortable position of admitting he violated the parole rules or recanting his testimony on direct examination to the effect that the five hundred odd dollars found on his person at the time of his arrest were won in a crap game.

The trial judge instructed the jury that association with ex-convicts, "people with a record," was neither a crime nor a misdemeanor in New York. This was in accord with the argument of Tomaiolo's counsel. He also charged that evidence of conviction of crime as affecting credibility is limited to conviction of felony, an infamous crime or a crime involving moral turpitude.

But what we have here is not an improper attack upon Tomaiolo's character, nor an improper attack upon his credibility by emphasizing matters not pertinent to his credibility under federal law. This is merely a case of meeting irrelevant matter introduced by the defense. This has always been permitted, and is matter for discretionary rulings by the trial judge to prevent abuse. To have prevented the prosecutor from bringing out these matters in this case would have been, in my judgment, a clear abuse of discretion. Were the rule otherwise a prosecutor would have to sit idly by while astute lawyers, wise in the ways of jurors and familiar with every cunning maneuver known to those experienced in the trial of criminal cases, sabotaged the Government's case with a series of seemingly innocuous irrelevancies. The trial of a criminal case is no place for this sort of heads I win tails you lose game.

There is another instance of the same sort of thing in the cross-examination of Nicholas Tomaiolo. On direct examination it was brought out that the witness had served in the army, had served overseas and had been honorably discharged. On cross-examination it appeared that during much of the time he spent in the armed forces he was AWOL for which he was sentenced by court martial on three separate occasions to six months imprisonment. Was the jury to be left with the impression that such a man had served his country well and honorably?

Another instance, which is also specified as an impropriety on the part of the prosecutor, is a variant of the same principle of completeness. As a result of a conscious or unconscious cooperation between counsel for Soviero and counsel for Tomaiolo certain new matter was introduced during the cross-examination of Pauline Katz. Like the others discussed above the irrelevant facts introduced seem of little consequence, until one becomes aware of the implications involved in this subtle and indirect approach. But we are entitled to assume that when experienced counsel ask questions, they have a purpose in mind. One can never be absolutely certain what that purpose is. At the same time it is clear to me that whatever is brought out by the defense, however seemingly unimportant, may be rebutted by the prosecutor; and this rebuttal may be by the introduction of other evidence or by argument in summation.

Maurice Edelbaum, counsel for Tomaiolo, had represented him at the time he pleaded guilty to the first robbery in 1941, he also was the lawyer consulted by Nicholas Tomaiolo who advised Nicholas to plead the Fifth Amendment when called to testify before the Grand Jury. During the long direct examination of Pauline Katz not a word had been said about any consultation between Pauline Katz and Mr. Edelbaum nor of any attempt by Pauline Katz to retain Mr. Edelbaum as her lawyer.

Counsel for Soviero, however, opened the subject and brought out the fact that a day or two before she was called before the Grand Jury Pauline Katz had called Mr. Edelbaum. Mr. Edelbaum, further cross-examining Pauline Katz, followed this up. He brought out that he went to her apartment and had a conversation with her. Then follow a number of leading questions. Did she tell him that she had been forced to make a statement about Tomaiolo. "Forced? No." Did she tell him that she was called before the Grand Jury and didn't want to testi-

fy. "No." Had he told her that at that time he represented Tomaiolo on a violation of parole. "You told me you were defending Charles Tomaiolo, but you didn't tell me for what reason." Finally, Mr. Edelbaum brought out that he told her he could not or would not talk to her, that he told her to get a lawyer who had no interest in the case; and she said "Correct" to his statement that he spent about three to five minutes in the apartment and then left.

What was this supposed to prove? Were these questions merely designed to bring out the fact that Mr. Edelbaum was an ethical lawyer? Or was the sequence designed to sow another of those seeds, to germinate in the minds of jurors and bear fruit? Surely one purpose was to attack the credibility of Pauline Katz by suggesting the thought that if the conversation took so short a time Pauline Katz really knew nothing about any connection between Tomaiolo and the robbery of the Brentwood bank, and that her testimony for the Government was a tissue of lies. It was entirely proper for the prosecutor to rebut this inference, whether or not argued in defense summations, by claiming that the more reasonable inference was that whatever Pauline Katz said to Mr. Edelbaum was quite consistent with her testimony at the trial. And so he said:

> "Now, Gentlemen, you are not to leave your good hard common sense at home when you sit here in the jurybox. If she had told him anyone in the world other than Charlie Tomaiolo had committed this robbery, do you think he would have only spent 3 or 4 minutes with her. He would have been so tickled to get this, to hear this, to get all the evidence he needed in this situation he would have been there for an hour."

There is nothing inflammatory about this argument. Nor can I perceive anything about it to merit rebuke by the trial judge. It will be a sorry day for the law when trial counsel for either side are deprived of the right to argue inferences to be drawn from the evidence.

Nor is there anything sacrosanct about lawyers. Here the subject matter of the discussion was brought out by counsel for the defense and he is not in a position to complain if the prosecutor asks the jury to draw an inference at variance from the one apparently intended when the questions were answered. Viewed in another light, the prosecutor here did no more than suggest a possible explanation of why the interview of a potential witness familiar with the details of the robbery consumed so short a time. And I do not find the hypothesis an unreasonable one.

This is not a case of counsel stating to the jury as facts matters having no basis in the evidence, or otherwise suggesting possession of evidence not before them. Nor is it a case of stressing facts which should not influence their decisions, such as that someone is a member of a minority group, that a party is a corporation or is insured, that crime is on the increase in the area, or that the defendant will or may be treated leniently if convicted. In short, I am aware of no principle which would affirmatively bar suggesting such an inference.

Nor is it significant that the inference is not compelling. "Counsel is allowed much latitude in drawing and arguing inferences from the evidence; he may draw conclusions from the evidence on his own system of reasoning, although such inferences as stated by counsel are inconclusive, improbable, illogical, erroneous, or even absurd, unless such conclusions are couched in language transcending the bounds of legitimate argument." 88 C.J.S. Trial § 181 c, citations omitted. See also 53 Am.Jur., Trial § 485.

Moreover, if it be assumed that the prosecutor's remark was improper, it does not follow that a new trial must be ordered. In the circumstances of this case the argument was at best of negligible significance. Mrs. Katz testified that Charles Tomaiolo was one of the robbers and the jury had ample opportunity to assess her credibility. In view of this fact, and of the strength of the

Government's case, the error, if there was error, was harmless.

The decision of the Supreme Court, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931, reversing the judgment in United States v. Grunewald, 2 Cir., 233 F.2d 556, was handed down on May 27, 1957. The trial in the case before us took place in October, 1956. The most serious point urged as ground for reversal by appellant Tomaiolo is that, on the cross-examination of his brother Nicholas Tomaiolo the prosecutor was permitted, over objection, to bring out the fact that Nicholas had been called to testify before the Grand Jury and had refused to answer a question as to whether he knew Charles Tomaiolo, on the ground that his answer might incriminate him. On the same ground he made a general statement that he would refuse to answer any questions "in connection with the matter" of the robbery of the Brentwoood bank.

Was it error, in the light of the ruling in Grunewald, to receive this evidence? In that case the Court first considered whether there was, in fact, any inconsistency between the defendant's grand jury testimony and his statements at the trial, and found that there was none. The questions asked of the defendant Halperin before the Grand Jury, if answered truthfully, would have required that he admit certain contacts with the other defendants. Halperin admitted such contacts at the trial. The Court felt that, although completely innocent, the defendant was nevertheless justified in refusing to answer questions which would link him with others who were under investigation. The Court stated, 353 U.S. at pages 423–424, 77 S.Ct. at page 983:

"We are not unmindful that the question whether a prior statement is sufficiently inconsistent to be allowed to go to the jury on the question of credibility is usually within the discretion of the trial judge. But where such evidentiary matter has grave constitutional overtones, as it does here, we feel justified in exercising this Court's supervisory control to pass on such a question. This is particularly so because in this case the dangers of impermissible use of this evidence far outweighed whatever advantage the Government might have derived from it if properly used. If the jury here followed the judge's instructions, namely, that the plea of the Fifth Amendment was relevant only to credibility, then the weight to be given this evidence was less than negligible, since, as we have outlined above, there was no true inconsistency involved; it could therefore hardly have affected the Government's case seriously to exclude the matter completely. On the other hand, the danger that the jury made impermissible use of the testimony by implicitly equating the plea of the Fifth Amendment with guilt is, in light of contemporary history, far from negligible."

The case before us has no "grave constitutional overtones," such as were present in the Grunewald case. The defendant Tomaiolo cannot validly contend that his constitutional rights were infringed since his testimony is in no way involved in this aspect of the appeal. Nor were the constitutional rights of the witness, Nicholas Tomaiolo, impaired by the admission of this evidence as his guilt or innocence were not in issue in the trial. Thus, the fact that "an innocent man may honestly claim that his answers may tend to incriminate him" is immaterial here. The question with which this court is confronted is "whether in the particular circumstances of this case the cross-examination should have been excluded because its probative value on the issue of (Nicholas Tomaiolo's) credibility was so neglible as to be far outweighed by its possible impermissible impact on the jury." Grunewald v. U. S., supra, 353 U.S. at page 420, 77 S.Ct. at page 982. In the Grunewald case the "impermissi-

ble impact" was that the jury might well consider that the defendant was guilty merely because he had pleaded the Fifth Amendment. The problem presented by the case at bar is quite different, for here the showing was that a witness other than the defendant had invoked the privilege, and the tendency to equate such action with guilt could only indirectly be harmful to the defendant.

Nicholas Tomaiolo's testimony before the Grand Jury was inconsistent with that which he gave at the trial. When he appeared before the Grand Jury the witness refused to answer any question regarding the bank robbery. Yet when he testified at the trial he denied that he was involved in the robbery, and he also denied lending the car or even meeting the alleged robbers on the day of the crime. Such testimony is not consistent with a refusal to answer any questions concerning the robbery on the ground that the answers might tend to incriminate the witness. While Tomaiolo, although not involved in any way with the robbery, might have been unwilling to admit any association with his brother because of the belief that such testimony might incriminate him, there can be no reason for him to have felt that his truthful denial of any complicity in the crime could also have been used to his detriment. Thus, while Nicholas Tomaiolo could justifiably claim the Fifth Amendment privilege when asked whether he knew someone who was suspected of robbing the bank, he could not also, in a manner consistent with his testimony at the trial, refuse to answer any questions regarding the robbery. This inconsistency gave sufficient evidentiary value to the Grand Jury testimony to outweigh any prejudicial effect it might have had on the jury's consideration of Nicholas Tomaiolo's testimony as a whole. In any event, there is no basis, as there was in Grunewald, for a holding that the trial judge's action in admitting the testimony for the purpose of im-

peaching the witness's credibility was an abuse of discretion.

Moreover, so many other matters brought out on cross-examination demonstrated that Nicholas Tomaiolo was unworthy of belief, and the evidence of the guilt of these two appellants is so overwhelming that I conclude that this particular incident could not in any event have affected the result.

Another point urged as ground for reversal in a brief submitted by appellant Soviero *pro se* is that it was error for the trial judge to refuse to direct the prosecution to produce an FBI report containing a list of the items found on Soviero at the time of his arrest. FBI Agent Liddy testified that several cards were found on this defendant's person when he was arrested, including a social security and a business card each containing a name other than "Soviero," but that no money was found on the defendant. Agent Liddy stated on cross-examination that "the entire possessions were tabulated by another agent and held as evidence," and that a formal memorandum of what was found on Soviero was prepared. There is no evidence to indicate that such a report was prepared by agent Liddy or under his direction. Hence, this situation does not come within the rule of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, which required that the prosecution make available to the defense, for the purposes of cross-examination, FBI reports prepared by the witness and relevant to his testimony at the trial.

Many other alleged errors are specified but they are of trivial consequence when the record is considered as a whole. The evidence which completely demolished appellant Tomaiolo's claim of alibi was properly received, as was the proof of his extravagant expenditures and those of his wife after the robbery and the evidence that Nirenberg had given $500 to Louis Soviero to retain Mr. Edelbaum to defend Tomaiolo. The fact that wit-

nesses often say "I think" or "I believe" is a matter of argument to the jury rather than reason for exclusion of the testimony, as we have often pointed out. The motion for a mistrial because the prosecutor said he would not hesitate to convict and didn't think the jury would hesitate very long in this case was properly denied. This was not misconduct on the prosecutor's part since he did not intimate to the jury that he had other evidence, not introduced in court, from which he knew the defendants to be guilty. Henderson v. United States, 6 Cir., 218 F.2d 14, 50 A.L.R.2d 754, certiorari denied 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253; Annotation, 50 A.L.R.2d 766. Also the trial judge instructed the jury to disregard the statement and I do not see how it could have been prejudicial, as no one could have listened to every phase of this bitterly contested trial without some suspicion of the fact that the prosecutor thought the defendants were guilty. See United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631. I shall not further lengthen this opinion by discussing the other alleged errors. There is no merit in the claims of appellants with reference to any of them.

It is only fair to add, in all humility and with all due respect for my brothers, that I can find no basis whatever in this record for the animadversions on the conduct of the trial judge nor for the excoriation of the prosecutor, who, in my judgment, only did his duty.

I am grateful to Marvin Schwartz and Andrew N. Heine, assigned counsel for appellant Soviero, for their earnest and highly competent presentation of his appeal in this case.

I would affirm both convictions; but the sentence of Tomaiolo on Count 2 must be vacated, as the crime alleged in Count 2 merged on the rendition of the verdict into the crime alleged in Count 3. United States v. Nirenberg, 2 Cir., 242 F.2d 632, certiorari denied 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539.