THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EDWIN W. ASHBY, Appellant.

Third Department, December 31, 1959.

*Paul Rosen, N. LeVan Haver* and *John E. Egan* for appellant.

*Bernard Tompkins, Special Assistant Attorney-General in Charge, Ulster County Investigation* (*Leonard E. Reisman, Wilfred R. Caron* and *Robert Orseck* of counsel), for respondent.

FOSTER, P. J.   Appellant has been found guilty of perjury in the second degree on two counts after a jury trial at an Extraordinary Trial and Special Term of the Supreme Court held in Ulster County.   The indictment upon which appellant was tried contained two counts, one for perjury in the first degree and one for perjury in the second degree.   The charges were based upon testimony given by appellant before the Grand Jury impanelled at the Extraordinary Term, which at the time was conducting an investigation into alleged corrupt practices of public officials in Ulster County, and specifically concerning an alleged practice on the part of such public officials of receiving bribes or kickbacks for the purchase of snow removal equipment.

A brief background of the *dramatis personæ* involved, concerning which there is no dispute, may be helpful in pointing up what we consider to be vital issues.   Between the years 1953 and 1956 one Frank Buckley, since deceased, was a dealer in Troy, N. Y., engaged in selling heavy motor vehicle equipment. He had an agent in Ulster County whose name was Harry Bareika.   They sold a great deal of snow removal equipment

to various municipalities in Ulster County in the years mentioned. The appellant Ashby was the Commissioner of Jurors for Ulster County during most of the period mentioned, having been appointed to that office in May, 1954. He had been active in politics for a number of years, and a member of the Republican County Committee of Ulster County since the early nineteen forties. Also during the years mentioned one Arthur H. Wicks, a witness on the trial, was a State Senator for the district embracing Ulster County and Chairman of the Republican County Committee of Ulster County.

We now advert to matters that may be the subject to some controversy, but concerning which evidence was given upon the trial. The Grand Jury subpœnaed certain records of the deceased Buckley, which seemed to indicate that much of the snow removal equipment sold in Ulster County was sold at inflated prices, higher than list prices set by the manufacturer. It also discovered a number of checks drawn by Buckley to the order of appellant, in a total sum of something over $19,000. Appellant cashed six of these checks, totalling $15,500, at a bank in Troy, N. Y.

He was called before the Grand Jury and interrogated as to the foregoing transactions. He declined to sign a general waiver of immunity, and signed a waiver limited to his official acts as the Commissioner of Jurors for Ulster County. Nevertheless he was sworn and permitted to testify. On his first appearance before the Grand Jury on October 2, 1958, he gave an explanation, substantially as follows: that the checks from Buckley were received by him as commissions for services rendered in connection with "bird-dogging", as he characterized it; i.e., furnishing Buckley with leads as to where snow removal equipment could be sold. That aside from some moneys which he turned back to Buckley he kept the major share of the proceeds and spent it for his own personal uses. This testimony he subsequently admitted was false, and it forms the basis for the first count in the indictment against him. He was directed to appear before the Grand Jury again the following day at 2:00 P.M.

On the day following his first appearance before the Grand Jury he consulted with counsel and admitted to the latter that his testimony the preceding afternoon was false. He was advised that he should recant and tell the Grand Jury the truth about the disposition of the proceeds derived from Buckley's checks. His counsel testified for appellant on the trial, and appellant personally waived the privilege of any confidential communications between attorney and client. His counsel arranged for a postponement of his appearance again before the Grand Jury,

and several conferences were held between his counsel and the Special Prosecutor, at one of which appellant was present. Subsequently, and on October 27, appellant appeared before the Grand Jury with a letter which his counsel had dictated. The opening paragraph of this letter was to the effect that he desired to purge himself of any possible contempt or perjury proceeding arising out of his previous testimony. Then he stated that he went to Troy to see Buckley at the request of Senator Wicks, and was advised by the latter to do whatever Buckley told him to do. Buckley gave him checks which he cashed, and with one exception, he turned back the proceeds to Buckley who gave him $100 each time. However he reported the amount of each check in his income tax returns and Buckley reimbursed him for the extra tax on moneys which he did not actually receive. The checks cashed were not for commissions but were checks received from Buckley and cashed at his request after appellant had gone to see Buckley at the request of Wicks. In addition to the letter he read appellant gave some oral testimony during the course of which he said he told a false story on his first appearance before the Grand Jury in order to protect Senator Wicks — that he did not want the latter's name brought in if he could help it.

Appellant appeared before the Grand Jury again on November 14 for a brief period of questioning, but his testimony then does not appear to have sufficient materiality to the issues before us to require comment. Subsequently an indictment was filed against him for perjury as heretofore stated. The second count in the indictment was based upon the charge that his testimony on his second appearance was contrary to that given on his first appearance, without specification as to its falsity.

Aside from any question that his constitutional rights may have been violated, a matter that will be commented upon later, it is obvious the only defense appellant had to the charges of perjury was that of recantation. It is true that he now raises the issue that there was no proof of the falsity of his first story independent of his own admission, but we do not regard this point seriously. He not only admitted to the Grand Jury the falsity of his first story, but he also admitted the same fact to his own counsel and permitted the latter to testify to that effect.

The defense of recantation may be a valid one in a proper case (*People* v. *Gillette,* 126 App. Div. 665). Its limitations have been prescribed by the Court of Appeals in its last word on the subject in the following language. "Accordingly, we hold that recantation as a defense is primarily designed to correct knowingly false testimony only if and when it is done promptly before the body conducting the inquiry has been deceived or misled to

the harm and prejudice of its investigation, and when no reasonable likelihood exists that the witness has learned that his perjury is known or may become known to the authorities. Thus, as a practical matter, the use of recantation as a defense should always depend on the circumstances of the given case (*Llanos-Senarillos* v. *United States*, 177 F. 2d 164; *United States* v. *Norris*, 300 U. S. 564; Penal Law, § 1620)." (*People* v. *Ezaugi*, 2 N Y 2d 439, 443.) The Trial Justice charged the elements of recantation in substantially the language quoted from *Ezaugi* case. The jury in finding appellant guilty of perjury, second degree, on two counts, quite evidently rejected the defense of recantation but it cannot be told from their verdict whether they rejected it because they believed the second story false, or for other reasons.

Granted that recantation may be a good defense it is elementary that the appellant was entitled to a fair trial as to every element of such defense, and particularly as to whether or not the recantation itself embodied the truth. In this respect we think certain aspects of the trial were prejudicial to the appellant. On this phase of the case we refer to the testimony of former Senator Wicks and the witness Bareika.

Wicks, as a witness for the People, testified that he never had any business connections with Frank Buckley; that he met Buckley once at a political convention at Saratoga but never had any social relationship with him; that he never sent appellant to Buckley for the purpose of cashing any checks or for any other purpose; and that he never received any money or political contributions from Buckley. He also testified that he received three political contributions from Bareika, one of $500, one of $800 and one of $1,000. He denied that he had ever discussed with appellant any conversations the latter had with Buckley. If this testimony was true then of course the jury was bound to find appellant's recantation was false; hence the testimony of Wicks was of paramount importance to both the prosecution and the defense.

Bareika, the former employee of Buckley, testified as a witness for the defense. He said that once a year from 1947 to 1955 he delivered contributions from Buckley to Wicks at the latter's private office; that the contributions were delivered personally and on each occasion he told Wicks they were from Frank in Troy. When the contributions were in cash they were in the sum of $1,000, but on some occasions they were in envelopes. He also said that on one occasion he took appellant to Troy to meet Buckley, and a check was then cashed but appellant refused to tell him for what amount.

This testimony was also of great importance to both sides for obviously if Bareika told the truth then Wicks did not. Hence the veracity of Bareika and the credibility the trial jury might attach to his testimony was of vital import to appellant. If Bareika was disbelieved and Wicks' testimony accepted then the main prop of appellant's defense — the truth of his recantation — necessarily collapsed. In that situation the trial court permitted a line of cross-examination which we think was highly prejudicial. Some 15 questions were asked of Bareika, and answers required over the objection of appellant's counsel, if he did not refuse to answer certain questions propounded to him by a Commissioner of Investigation as to his dealing with officials of Ulster County on the ground that his answers might tend to incriminate him. The only purposes that such questions could possibly serve was that of prejudice or an attack on the credibility of the witness. The former would be highly improper, and as to the latter, the claim of a constitutional privilege before a different forum can never serve to affect the credibility of a party or a witness in some other trial (*Halperin* v. *United States,* 353 U. S. 391; *United States* v. *Tomaiolo,* 249 F. 2d 683; *People* v. *Luckman,* 254 App. Div. 694). As indicated in the cited cases an examination of his character is almost certainly bound to unfairly and adversely affect the jury's estimate of a witness. The assertion of a constitutional privilege, however unpopular such an assertion may have become in the clamor of the hour, is a right that should not be diluted upon any theory affecting credibility thereafter. The People attempt to justify this line of examination on the basis that appellant's counsel opened the door when he showed that Bareika had been subpœnaed by the People and had not been called by the prosecution. We do not so view the matter. And moreover we think the prejudice engendered was aggravated by a statement of the Special Prosecutor when on the witness stand that he knew Bareika was represented by John Egan (an attorney) and every one of John Egan's clients refused to testify before the Grand Jury and claimed immunity.

In view of the foregoing we are constrained to the view that the cross-examination of Bareika was so prejudicial to the appellant upon a vital element of his defense as to require a reversal and a new trial.

We find it unnecessary to consider or discuss other errors alleged. The appellant has raised, however, for the first time the issue of whether his constitutional rights were violated when he was sworn as a witness before the Grand Jury, after refusing to sign a general waiver of immunity, on the ground that he

was a prospective defendant or target of the investigation (*People* v. *Gillette*, 126 App. Div. 665, *supra*; *People* v. *Ryan*, 6 N Y 2d 214). We have grave doubts whether we may consider such an issue raised for the first time on appeal. We find no case where an attack upon an indictment based on constitutional grounds has been allowed after a judgment of conviction (*People* v. *Van Allen*, 275 App. Div. 181). There is however authority for such an attack after a new trial has been granted on the theory that where a new trial is ordered it shall proceed in all respects as if no trial had been had (*People* v. *Nitzberg*, 289 N. Y. 523). Thus while we decline to entertain such an issue on this appeal the way is paved for appellant to move, if he is so advised, before the Extraordinary Term or the Appellate Division to dismiss the indictment on constitutional grounds.

The judgment of conviction should be reversed and a new trial directed.

BERGAN, COON, HERLIHY and REYNOLDS, JJ., concur.

Judgment of conviction reversed and a new trial directed.